Jeffery D. McFarland (SBN 157628)
  jmcfarland@mckoolsmith.com
Grant J. Maxwell (SBN 275329)
  gmaxwell@mckoolsmith.com
**MCKOOL SMITH HENNIGAN, P.C.**
300 South Grand Avenue, Suite 2900
Los Angeles, California 90071
Telephone:   (213) 694-1200
Facsimile:    (213) 694-1234

Attorneys for Plaintiff
Honey Bum, LLC

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HONEY BUM, LLC, a California limited liability company,<br><br>                Plaintiff,<br><br>    vs.<br><br>FASHION NOVA, INC., a California corporation; RICHARD D. SAGHIAN, an individual; and DOES 1 through 10, inclusive,<br><br>                Defendants. | Case No. 20-cv-11233 RGK AS<br><br>**AMENDED PLAINTIFF HONEY BUM, LLC'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**\*REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL\***<br><br>[*Statement of Uncontroverted Facts and Conclusions of Law and Declaration of Jeffery McFarland filed concurrently*]<br><br>Date:      December 20, 2021<br>Time:     9:00 a.m.<br>Crtrm:    850<br><br>Complaint Filed;  December 20, 2020<br>Trial Date: January 18, 2022 |

McKool Smith Hennigan, P.C.
Los Angeles, CA

# TABLE OF CONTENTS

**Page(s)**

I.   PRELIMINARY STATEMENT ............................................................... 1

II.   STATEMENT OF FACTS ................................................................... 3

III.  LEGAL STANDARD ........................................................................ 6

IV.  ARGUMENT ................................................................................... 6

    A.   The Court Should Deny Summary Judgment as to the Section 1 Claim ................................................................................... 6

        1.   Honey Bum has shown antitrust injury more than sufficient to recover for the illegal group boycott. ........................... 7

        2.   Evidence of Horizontal Conspiracies Unquestionably Exists. ........ 8

        3.   Per Se Treatment Is Appropriate Here ............................ 12

        4.   Plaintiff Need Not Show Market Power But Can Do So Nonetheless. .................................................... 16

    B.   Summary Judgment is Inappropriate as to the Tortious Interference Claims ............................................................. 18

        1.   Tortious Interference With Economic Relations ................... 18

        2.   Tortious Interference With Contract ............................. 19

V.   CONCLUSION .............................................................................. 20

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)................................................................6, 11, 16

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,
    11 Cal. 4th 376 (1995)...................................................................18

*Edwards v. Arthur Andersen LLP*,
    44 Cal. 4th 937 (2008)...................................................................18

*Fed. Trade Comm'n v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020)..........................................................7, 9

*Fineman v. Armstrong World Indus., Inc.*,
    980 F.2d 171 (3d Cir. 1992)............................................................17

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015).......................................................7, 12

*Ixchel Pharma, LLC v. Biogen, Inc.*,
    9 Cal. 5th 1130 (2020)...................................................................19

*Johnson v. Mammoth Recreations, Inc.*,
    975 F.2d 604 (9th Cir. 1992)............................................................2

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
    359 U.S. 207 (1959).................................................................7, 12, 13

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984).........................................................................9

*Movie 1 & 2 v. United Artists Commc'ns, Inc.*,
    909 F.2d 1245 (9th Cir. 1990)...........................................................6

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*
    ("*NCAA*"),
    468 U.S. 85 (1984)................................................................9, 16, 18

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
    50 Cal. 3d 1118 (1990)...................................................................19

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*Pacific Stationery & Printing Co.*,
   472 U.S. 284 (1985)......................................................................8, 12, 13

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ......................................................... 16

*Rossi v Standard Roofing*,
   156 F.3d 452 (3d Cir. 1998) ............................................................ 8

*Spectators' Commc'n Network Inc. v. Colonial Country Club*,
   253 F.3d 215 (5th Cir. 2001) ......................................................... 15

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
   875 F.2d 1369 (9th Cir. 1989) ....................................................... 17

*Toys "R" Us, Inc. v. F.T.C.*,
   221 F.3d 928 (7th Cir. 2000) ....................................................14, 15

*Trans World Airlines, Inc. v. Am. Coupon Exch., Inc.*,
   913 F.2d 676 (9th Cir. 1990) ......................................................... 18

*United States v. Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015) .......................................................11, 15

**STATUTES**

Cal. Bus. & Prof. Code § 16600 .......................................................... 19

Cal. Com. Code § 2004 ....................................................................... 20

Cal. Com. Code § 2204 ....................................................................... 20

Fed. R. Civ. P. 56(a) ............................................................................. 6

McKool Smith Hennigan, P.C.
Los Angeles, CA

iii

McKool Smith Hennigan, P.C.
Los Angeles, CA

## I.    **PRELIMINARY STATEMENT**

Documents and testimony uncovered in discovery have made it abundantly clear that defendants Fashion Nova, Inc. ("Fashion Nova") and Richard D. Saghian (collectively, "Defendants") did ***exactly*** what plaintiff Honey Bum, LLC ("Honey Bum" or "Plaintiff") alleges in its First Amended Complaint. Specifically, Defendants: (1) organized and enforced an illegal group boycott among key suppliers of "fast-fashion"[1] merchandise preventing Honey Bum (and at least one other fast-fashion retailer) from acquiring goods for resale in violation of Section 1 of the Sherman Act ("Section 1"); and (2) interfered with Honey Bum's contractual and business relationships with these same suppliers, or vendors. Defendants documented their brazen actions by creating a spreadsheet they named ███████████ that outlined Defendants' systematic attack on Honey Bum (and a second retailer) noting—by vendor and specific representative contacted—each vendor's agreement to participate in the boycott of Honey Bum using the ***HTML source code*** underlying Plaintiff's website as a roadmap. The evidence unequivocally shows that what began as Mr. Saghian's personal vendetta against Honey Bum's CEO quickly devolved into Defendants orchestrating a widespread boycott amongst the network of key fast-fashion vendors to unconditionally restrain the vendors' ability to sell items to the open market. Shockingly, Defendants made no efforts to conceal their illegal activity. Testimony and other documents detail Mr. Saghian's and Fashion Nova's efforts to leverage clout and market-dominance to coerce each of their most important vendors to cancel orders and cease from doing business with Honey Bum.

Notwithstanding overwhelming proof of their illegal acts, Defendants now move for summary judgment (the "Motion"). Nonetheless, Defendants' Motion misconstrues the law, misrepresents the facts, and, critically, fails to address key

---

[1] "Fast fashion" is distinct from "traditional" fashion. Fast-fashion retailers rely on vendors to design, manufacture, ship and deliver ready-to-sell merchandise in response to emerging trends and rapidly changing demand—often in days. By contrast, traditional retailers typically maintain their own design teams, manufacturing facilities and supply chains, and plan seasonal collections months in advance.

aspects of Honey Bum's claims.

*First*, ignoring the evidence of their clear violations of Section 1, Defendants incorrectly assert that Plaintiff's *per se* claim must fail because Honey Bum cannot establish:  (1) any horizontal conspiracy; (2) harm to competition; and (3) market dominance.  However, it is well-settled that *per se* cases do not require evidence of either harm to competition or market dominance.  The only proof required is evidence—direct or circumstantial—of a horizontal conspiracy constituting an unreasonable restraint on trade.  The record is flush with evidence of horizontal agreements.  Further, where, as here, there is substantial evidence of vertical agreements to participate in a group boycott, horizontal agreements can be implied. Even if Honey Bum were required to produce evidence of harm to competition and market dominance (which it is not), summary judgment would still be inappropriate as both issues require a highly-factual inquiry into relevant market and thus are to be resolved by the trier of fact.  Nonetheless, the evidence—including Mr. Saghian's own statements—demonstrates Fashion Nova's dominance in the marketplace and shows that the vendors are the ***only*** source of essential fast-fashion merchandise in the Los Angeles marketplace.  Thus, even if required, both can be easily established.

*Second*, Defendants' arguments with respect to Plaintiff's tort claims are similarly unavailing.  Defendants seek dismissal of the tortious interference with prospective business and contract claims on the grounds that Honey Bum cannot demonstrate an independent wrong.  Because Defendants have *per se* violated the Sherman Act, Defendants' argument is moot.  Notwithstanding, the *California Business and Professions Code* makes unlawful every contract that restrains a party from engaging in a lawful business.  The illegal agreements Defendants made with the vendors did just that.  Moreover, the evidence plainly demonstrates Defendants' intentional interference with known existing business relationships and contracts and Defendants' reliance on "at will" employment law cases simply misses the mark.

As set forth herein, the Motion should be denied as disputed material facts exist

1    and neither the misrepresented case law cited by Defendants nor Defendants

2    misconstrued version of the evidence dictates otherwise.

3    **II.    STATEMENT OF FACTS**

4         Formed in 2017, Honey Bum is a Los Angeles-based, social media driven, fast-

5    fashion retailer that offers trendy, cost-conscious clothing to its target customers.

6         Fashion Nova was formed in 2006 and is the largest fast fashion retailer in Los

7    Angeles.  Mr. Saghian is the Founder, Chief Executive Officer and ███████

8    █████████.  Unsurprisingly, both Fashion Nova and Honey Bum rely on many of

9    the same vendors in the Los Angeles fashion district for their supply of goods.

10        Honey Bum opened its online storefront in July 2017. *See* Declaration of

11   Jeffery D. McFarland ISO Opposition ("JDM Decl."), Ex. 1 at 17:18-20.  Almost

12   immediately thereafter, Defendants began creating reports detailing the product

13   names, price, and supplying vendor of the products listed on Honey Bum's website.

14   *See* JDM Decl., Exs. 62-77.  Ms. Juliana Wise, Mr. Saghian's former executive

15   assistant, testified that Mr. Saghian showed her how to identify the vendor that

16   supplied a specific item listed by viewing the HTML source code underlying Honey

17   Bum's website.  *See* JDM Decl., Ex. 3 at 78:8-23. With this information, Ms. Wise

18   and other Fashion Nova employees, at the direction of Mr. Saghian, created extensive

19   reports (at times, on a weekly basis) detailing from which vendor Honey Bum was

20   buying merchandise.  *See* JDM Decl., Ex. 3 at 78:8-23; Exs. 62-77.

21        On January 29, 2018, Ms. Catherine "Cat" Morisano, Fashion Nova's Vice

22   President of Merchandising, prepared a spreadsheet entitled ███████████

23   containing the product and vendor information for Honey Bum and a second retailer,

24   Bomb Posh.  *See* JDM Decl., Exs. 4, 7, 82. The spreadsheet lists the names of

25   products, the supplying vendor, the vendor's representative contacted, and the

26   representative's response to Defendants' demands. *Id*.  Ms. Morisano shared the

27   spreadsheet with Mr. Saghian and Ms. Wise the same day she created it.  *See* JDM

28   Decl., Exs. 5-6.  In the three months that followed, Ms. Morisano edited the ██████

McKool Smith Hennigan, P.C.
Los Angeles, CA

3

1    ███████ spreadsheet more than ███ times.  *See* JDM Decl., Ex. 7.

2       Documents produced in this action, including emails between Fashion Nova

3    employees and vendor representatives, confirm Defendants' plan of attack:

4    1.  <u>Better Be</u>. On August 23, 2017, Better Be emailed Fashion Nova stating that it

5        was ████████████████████████████████████████████████████████

6        ████████████████████████████████████████████████████████████

7        ███████████████████████  *See* JDM Decl., Ex. 8.

8    2.  <u>Rehab Clothing</u>. On January 24, 2018, Rehab Clothing emailed Fashion Nova

9        reporting that Honey Bum had placed an order of particular styles. In response,

10       Ms. Morisano directed another Fashion Nova employee to ████████████

11       ██████████████████████████████  *See* JDM Decl., Ex. 9.

12   3.  <u>May Pink</u>. On April 7, 2018, May Pink emailed Fashion Nova stating: ███

13       ████████████████████████████████████████████████████████████

14       ███████████████████████████████████████████████████  *See*

15       JDM Decl., Ex. 10.

16   4.  <u>January 7</u>. On April 28, 2018, January 7 Clothing emailed Fashion Nova

17       stating: █████████████████████████████████████████████████

18       ██████████████████████  *See* JDM Decl., Ex. 11.

19   5.  <u>Bozzolo</u>. On April 30, 2018, Bozzolo (Shine Imports) emailed Fashion Nova

20       stating: ███████████████████████████████████████████████████

21       ██████████████████████  *See* JDM Decl., Ex. 12.

22   6.  <u>Honey Punch</u>. On May 2, 2018, Honey Punch emailed Fashion Nova,

23       explaining ████████████████████████████████████████████████

24       ████████████████████████████████████████████████████████████

25       *See* JDM Decl., Ex. 13.  The representative then explained that ███████

26       ████████████████████████████████████████████████████████████

27       ████████████████████████████████████████████████████  *Id.*

28   7.  <u>Hot & Delicious</u>. On July 19, 2018, Hot & Delicious emailed Fashion Nova

McKool Smith Hennigan, P.C.
Los Angeles, CA

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

stating: █████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████  *See* JDM Decl., Ex. 14.  The

next day, this vendor reassured Fashion Nova that █████████████████

████████████████████████████████████████████  *Id.*

8. <u>Tea & Cup</u>. On July 20, 2018, Tea & Cup emailed Mr. Saghian stating: ██

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████  *See* JDM Decl., Ex. 15.

9. <u>Vibrant</u>. On May 17, 2019, Vibrant emailed Fashion Nova stating: ████████

███████████████████████████████████████████

██████████████████  *See* JDM Decl., Ex. 16.

When Honey Bum's CEO subsequently asked Mr. Saghian in a text message to stop blocking Plaintiff's supply, Mr. Saghian responded: ████████████████

████████████—something re-confirmed during his deposition.  *See* JDM Decl., Ex. 17 at 222:24-223:1.  Representatives from two vendors—Mr. Edgar Park of Bear Dance[2] and Ms. Elaine Tran of DTE Trading d/b/a Viva USA—testified that Ms. Morisano told them not to sell to Honey Bum.  *See* JDM Decl., Ex. 19 at 48:5-49:12; Ex. 18 at 46:8-47:8.  Both Mr. Park and Ms. Tran confirmed that ████████████████████

███████████████████████████████████████████

███████████████████████.[3]  *Id.*

Defendants continue to monitor Honey Bum's website and contact vendors that

[2] Mr. Park owns Bear Dance and is on the first page of their "***Retailers to Block***" spreadsheet where, in the response column, Ms. Morisano wrote:  "talking to new sales rep." *See* JDM Decl., Ex. 4.

[3] While a number of vendors denied being told by Fashion Nova and Mr. Saghian to "stop selling to Honey Bum," documents produced by Fashion Nova and, in some instances, those same vendors, state otherwise, undermining these vendors' credibility.  Furthermore, Mr. Saghian himself characterized the vendors as untrustworthy at his deposition in this case. *See* JDM Decl., Ex. 17 at 145:3-13.

McKool Smith Hennigan, P.C.
Los Angeles, CA

are selling or have sold products to Honey Bum. *See* JDM Decl., Exs. 20-21. On May 16, 2019, Fashion Nova emailed a vendor named Kratein: ███████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████ *See* JDM Decl., Ex. 20. On the same day, Fashion Nova emailed, Vibrant: ████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████ Fashion Nova emailed ███████████████████████████████ Fashion Nova emailed Vibrant the next day stating, ████████████████ *See* JDM Decl., Ex. 21.

## III.   LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  At summary judgment, the court does not weigh evidence and draws all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment is rarely appropriate in antitrust conspiracy cases as such cases are factually complex and conspirators are unlikely to be forthcoming with evidence of their culpability. *See e.g.*, *Movie 1 & 2 v. United Artists Commc'ns, Inc.*, 909 F.2d 1245, 1248, 1249 (9th Cir. 1990) ("Summary judgment is disfavored in complex antitrust litigation" and "[i]s appropriate only in the clear absence of any significant probative evidence").

## IV.   ARGUMENT

### A.   The Court Should Deny Summary Judgment as to the Section 1 Claim

Defendants are not entitled to judgment as a matter of law with respect to Honey Bum's Section 1 claim, pursuant to which a Plaintiff need *only* show, through *either* direct or circumstantial evidence, proof of "(1) the existence of an agreement, and (2) that the agreement was in unreasonable restraint of trade." *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 989 (9th Cir. 2020) (citation omitted).

Plaintiff has alleged a group boycott.  As the Supreme Court explained in *Klors v Broadway Hale*, "concerted refusals by traders to deal with other traders, have long

McKool Smith Hennigan, P.C.
Los Angeles, CA

1  been held to be in the forbidden category." 359 U.S. 207, 212 (1959). Also referred

2  to as a hub-and-spoke conspiracy, group boycotts are "simply a collection of vertical

3  and horizontal agreements" comprised of: (1) the hub—"a dominant purchaser"; (2)

4  the spokes—"competing manufacturers or distributors that enter into vertical

5  agreements with the hub"; and (3) the rim—"horizontal agreements among the

6  spokes." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192

7  (9th Cir. 2015). Indeed, group boycotts are *per se* unreasonable. *Id.* at 1191.

8  Defendants seek summary judgment arguing that there is insufficient evidence

9  to establish: (1) a horizontal conspiracy, (2) vendor dominance, or (3) harm to

10  competition. *See* Mot. at pp. 8-17. But Defendants misapply the law and misconstrue

11  the facts in connection with each of their three woefully inadequate arguments.

12      **1.   *Honey Bum has shown antitrust injury more than sufficient to recover***

13          ***for the illegal group boycott.***

14  Defendants argue that Honey Bum cannot show antitrust injury, but in doing so

15  fail to acknowledge decades of case law showing that Honey Bum is entitled to

16  recover here because the injuries that it has suffered are exactly the type of injuries

17  that the antitrust laws were designed to prevent. Defendants base their arguments on

18  citation to two sets of cases bearing no resemblance to the facts here and are therefore

19  irrelevant to the question of whether Honey Bum possesses antitrust injury arising

20  from a boycott organized by Defendants through common vendors.

21  The first set of wrongly applied cases cited by Defendants deal with pricing

22  conduct and whether a competitor's injury from such pricing conduct is recoverable.

23  *See* Mot. at pp. 8-9 (*citing Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421

24  (9th Cir. 1995); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 488 (1977);

25  *Pool Water Products v. Olin Corp.*, 258 F.3d 1024 (9th Cir. 2001); *Indiana Grocery,*

26  *Inc. v. Super Value Stores, Inc.*, 864 F.2d 1409 (7th Cir. 1989)). These cases hold that

27  a competitor does not have standing to bring claims arising from low pricing that

28  benefits consumers even though it may hurt the competitor. But, Honey Bum is not

McKool Smith Hennigan, P.C.
Los Angeles, CA

McKool Smith Hennigan, P.C.
Los Angeles, CA

complaining of Fashion Nova's pricing conduct and these cases do not speak to the situation of a competitor denied access to goods necessary in the competitive struggle.

Defendants second set of misapplied cases deal with joint ventures and whether or not market evidence should be considered in such cases. *See* Mot. at p. 9 (*citing Chicago Professional Sports Ltd. Partnership v. NBA*, 961 F.2d 667 (7th Cir. 1992); *Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.*, 810 F.2d 869 (9th Cir. 1987)); *see also Pacific Stationery & Printing Co.*, 472 U.S. 284 (1985)). Market considerations are **not** required in a *per se* analysis, but may be relevant to determining the appropriateness of *per se* treatment in the context of a joint venture or other clear circumstances suggesting pro-competitive justifications for the challenged conduct. As the Third Circuit explained in *Rossi v Standard Roofing*:

> In the usual rule of reason case, to establish a violation of § 1, plaintiffs must prove: (1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy. *Tunis Bros. Co., Inc. v. Ford Motor Co*., 763 F.2d 1482, 1489 (3d Cir. 1985) (citations omitted), *vacated on other grounds*, 475 U.S. 1105 (1986). ***Here, because per se analysis applies, prongs two and three are conclusively presumed satisfied and need not be addressed***."

*See Rossi v Standard Roofing*, 156 F.3d 452, 464-65 (3d Cir. 1998) (emphasis added).

As explained below, the group boycott that Defendants orchestrated is *per se* violation of Section 1 and thus Honey Bum need only show (1) conspiracy and (2) injury suffered by Honey Bum. Honey Bum can easily do so.

### 2. *Evidence of Horizontal Conspiracies Unquestionably Exists.*

To survive summary judgment, a Section 1 plaintiff must offer of "direct or

8

circumstantial evidence that reasonably tends to prove that the [suppliers] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). Once the plaintiff satisfies its evidentiary burden, the burden shifts to the defendant to show "a procompetitive rationale for the restraint." *Qualcomm*, 969 F.3d at 991. While Plaintiff has satisfied its evidentiary burden, Defendants have not—and cannot—offer any procompetitive justification for their illicit behavior.

Defendants instead assert that Plaintiff's *per se* Section 1 claim fails because Honey Bum lacks evidence of a horizontal agreement. *See* Mot. at pp. 13-17. Relying on *Musical Instruments*, Defendants wrongly assert Honey Bum must show "all vendors . . . entered into an explicit agreement amongst themselves" on the sole basis that each vendor "could benefit *only if every other vendor*" joined Defendants' conspiracy. *See* Mot. at pp. 14-15 (emphasis in original). Conceding that "some of the vendors Fashion Nova contacted ceased selling to Honey Bum entirely," Defendants frame their actions as a rimless hub-and-spoke conspiracy—"a series of vertical agreements between Fashion Nova and various suppliers." *See* Mot. at pp. 3, 13.

*Musical Instruments* requires neither "explicit agreement" nor that "every other vendor" join in Defendants' illegal scheme. In fact, an "explicit agreement is ***not*** a necessary part of a Sherman Act conspiracy—certainly not where, as here, a joint and collaborative action was pervasive in the initiation, execution, and fulfillment of the plan." *Gen. Motors*, 384 U.S. at 143 (emphasis added). Due to the high likelihood of anticompetitive effects, most horizontal restraints on price and output as *per se* illegal. *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma ("NCAA")*, 468 U.S. 85, 100 (1984). The ultimate question to determine whether the *per se* approach is appropriate is if "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." *Id.* (internal citation omitted). In such cases, "the restraint is presumed unreasonable without inquiry into the particular market context in which it is found." *Id.*

McKool Smith Hennigan, P.C.
Los Angeles, CA

The direct and circumstantial evidence here establishes that beginning in mid-2017, Defendants exerted their incredible market power to force L.A. fast-fashion vendors to agree to carry out the illegal boycott of Honey Bum and other competitive threats to Fashion Nova. In particular, after discovering Honey Bum had entered the fast-fashion retail marketplace, Mr. Saghian himself began ████████████ ███████████████████████████████████████████████████████████████████ ██████████████. *See* JDM Decl., Ex. 17 at 222:24-223:1. Mr. Saghian did not stop there, however; he took steps to build out detailed practices for his Vice President of Merchandise, Ms. Morisano, and other Fashion Nova employees to implement in carrying out his nefarious scheme. *See* JDM Decl., Ex. 3 at 78:8-23. These practices included showing employees how to use the HTML source code underlying Plaintiff's website to identify the name of the vendors supplying it and to track the styles and vendors on detailed reports. *Id*. Fashion Nova then used this information to create a hit list—the ███████████ spreadsheet—listing ██████████████████ ███████████████████████████████████████████████████ *See* JDM Decl., Exs. 4, 82. Further, documents prove the existence of illegal vertical agreements to block Honey Bum. *See* JDM Decl., Exs. 8-15.

Other emails show that as early as January 2018, Ms. Shin—then an employee of Rehab Clothing—began █████████████████████████████████ ████████████████████████████████████████████████████ *See* JDM Decl., Exs. 9, 13, 22. At some point in spring 2018, Ms. Shin left the employ of Rehab to join an unaffiliated vendor named Honey Punch. On May 2, 2018, Ms. Shin emailed Ms. Morisano to notify her that █████████████████████ █████████████████████████████████████████████████████████████ *See* JDM Decl., Ex. 13. Ms. Shin explained that because ██████████████████ ████████████████████████████████████████████████████████████████ *Id.*

McKool Smith Hennigan, P.C.
Los Angeles, CA

10

(emphasis added).  This is direct evidence of the horizontal spread of Defendants' illegal conspiracy and alone renders summary judgment inappropriate.

Circumstantial evidence also demonstrates the existence of Defendants' illegal group boycott.  Where, as here, an abundance of evidence proving vertical agreements exists, horizontal agreements can be implied. *See United States v. Apple, Inc.*, 791 F.3d 290, 324 (2d Cir. 2015) ("A horizontal conspiracy can use vertical agreements to facilitate coordination without the other parties to those agreements knowing about, or agreeing to, the horizontal conspiracy's goals.").

For instance, a separate horizontal agreement between Double Zero and Hyfve is readily demonstrable through circumstantial evidence.  Ms. Letty Garcia has represented both ███████████████.  *See* JDM Decl., Ex. 23 at 10:12-13, 16:21-22.  At the time of the illegal boycott, Ms. Garcia, was a representative ████████ ██████ *See id.* at 24:11-12.  Fashion Nova ███████████████████ *See id.* at 22:23-24:4. Although Ms. Garcia testified that ████████████████ ████████████████████████████████████ ████████████ Fashion Nova has listed ████████████ ████████████████ *See* JDM Decl., Ex. 4.  This gives rise to the strong inference that, notwithstanding Ms. Garcia's role ████████ ██████████ Fashion Nova ████████████████████████ ████████████████.  *Liberty Lobby*, 477 U.S. at 252.  Regardless, credibility is a determination for the trier of fact.

The extraordinarily close proximity of the vendors' businesses and the major trade show attended by the vendors multiple times per year also provide circumstantial evidence of conspiracy, when coupled with other evidence. An overwhelming number of key fast-fashion vendors are part of a small community located within two city blocks in downtown Los Angeles.  *See* JDM Decl., Ex. 24.  Some are even family. *See* JDM Decl., Ex. 1 at 139:2-3.  Even aside from working among each other every single day, the vendors also meet during the many fashion trade shows held every

11

1    year.  Defendants used one such show to further the illegal boycott.  In February 2018,

2    Fashion Nova attended MAGIC, a fashion trade show held in Las Vegas where ███

3    ████████████████████████████████████████  *See* JDM Decl., Ex. 25 at

4    285:18-25.  Mr. Edgar Park, the owner of a vendor named Bear Dance, testified that

5    Ms. Morisano approached him at the MAGIC show in early 2018 and asked that Bear

6    Dance refuse to do business with Honey Bum.  *See* JDM Decl., Ex. 18 at 46:8-47:8.

7    In the weeks that followed MAGIC, Bear Dance and a number of other vendors

8    refused to sell to Honey Bum.  *See* JDM Decl. Ex. 18 at 47:23-49:1.

9        Defendants opt not to address ***any*** of the evidence of horizontal agreement and

10   instead argue that the vendors each testified to acting independently without influence

11   of another vendor.[4] *See* Mot. at p. 14.  Despite Defendants' argument to the contrary,

12   "parallel conduct, such as competitors adopting similar policies around the same time

13   in response to similar market conditions, may constitute circumstantial evidence of

14   anticompetitive behavior."  *Musical Instruments*, 798 F.3d at 1193.  Courts hold that

15   such conduct can infer a conspiracy where the plaintiff establishes that the parallel

16   conduct is contrary to the actor's economic self-interest.  *Id.* at 1194-95.

17      **3.**    ***Per se treatment is appropriate here***

18        The Supreme Court has long recognized *per se* violations of antitrust cases

19   "involv[ing] joint efforts by a firm or firms . . . to disadvantage competitors by . . .

20   persuading or coercing suppliers . . . to deny relationships the competitors need in the

21   competitive struggle."  *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing*

22   *Co.*, 472 U.S. 284, 294 (1985); *see also Klor's, Inc. v. Broadway-Hale Stores, Inc.*,

23   359 U.S. 207, 212 (1959) ("Group boycotts, or concerted refusals by traders to deal

24   with other traders, have long been held to be in the forbidden category.").  This is

25

26   [4] Notably, there were several instances of vendor representatives' deposition

27   testimony directly contradicting the documentary evidence.  *Compare e.g.*, JDM
Decl., Ex. 80 at 37:13-18, *with* Ex. 16, at 15:23-17:5.  Such hesitancy to openly and

28   honestly testify in the presence of Fashion Nova's general counsel and outside counsel
is understandable given that ████████████████████████████████████
████████  *See* JDM Decl., Ex. 78.  Tremendous pressure remains on the vendors to
continue the group boycott of Honey Bum.

McKool Smith Hennigan, P.C.
Los Angeles, CA

12

because "such agreements . . . cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment" all while impairing the aggrieved competitor's "freedom to buy [supply] in an open competitive market." *Klor's*, 359 U.S. at 212 (citation omitted).

It is difficult to imagine a more apt application of this legal principal than a case in which the Defendants maintained a document entitled ███████████ that tracked each step of their efforts to "coerc[e] suppliers" to join Defendants' illegal conspiracy to deny Honey Bum—and others—access to "the [vendors] need[ed] in the competitive struggle." *Nw. Wholesale*, 472 U.S. at 294. In fact, Defendants' Motion does not dispute the ultimately successful efforts of Mr. Saghian, in his individual capacity, and Ms. Morisano, in her representative capacity for Fashion Nova, to block Honey Bum's—and Fashion Nova's other competitors—access to ***essential*** sources of supply. *See* JDM Decl., Ex. 25 at 98:25-99:20.

Defendants dedicate roughly a page and a half of the Motion to their expert's flawed understanding of economic principals and his disagreement with Honey Bum's experts' position. *See* Mot. at pp. 15-16. Without a coherent explanation, Defendants argue that economics preclude the finding of a horizontal agreement to boycott Honey Bum. *See id.* In their opinion, the vendors would prefer if their peers continued to deal with Honey Bum and Fashion Nova wrath (*i.e.*, get blocked). *Id.* Defendants further assert that, in the long term, the vendors can "only benefit" if Honey Bum continues to gain market share and become a rival in terms of sizes of orders. *Id.* The thrust of Defendants' argument is that Fashion Nova is a quickly-growing, global behemoth that operates on a different playing field than retailers like Honey Bum.[5] *See* Mot. at p. 4. Faced with threats from such a big and important customer, the vendors made the easy decision to appease Fashion Nova to the detriment of Honey Bum and anyone else that dare try to enter the L.A. fast-fashion market. *See id.*

---

[5] ████████████████████████████████████ *See* JDM Decl., Ex. 17 at 220:10-221:25. ████████████████████████████████████████████████████ *See, e.g.*, JDM Decl., Exs. 20, 38, 79.

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McKool Smith Hennigan, P.C.
Los Angeles, CA

Because cutting off Fashion Nova's competitors was in each vendor's own self-interest, Defendants argue that there is no way Honey Bum could show horizontal agreements. *See id.* at p. 14. As set forth above, Honey Bum has done so despite Defendants' assertions and well-settled law supports denying the Motion.

Defendants' arguments are remarkably similar to those expressly rejected by a Seventh Circuit panel in *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928 (7th Cir. 2000). Much like Fashion Nova's position in the L.A. fast-fashion market, Toys "R" Us ("TRU") was once "a giant in the toy retailing industry," accounting for approximately 20% of U.S. toy sales. 221 F.3d at 930. TRU historically purchased about 30% of total output from the largest manufacturers was widely consider "their most important customer." *Id.* TRU's stronghold in the market began falter in the late 1980s with the rise of warehouse clubs like Costco. *Id.* By 1989, TRU's executives became concerned with the impact of warehouse clubs on TRU's profits and initiated an investigation into its competition. *Id.* TRU's investigation was fruitful, revealing that the warehouse clubs "carried approximately 120-240 items in direct competition with TRU, priced as much as 25 to 30% below TRU's own price levels." *Id.* at 931. Armed with this information, TRU sent representatives to a large toy fair to "meet individually with each of its suppliers to explain [TRU's] new policy" that, among other things, required its suppliers to agree that they would not sell to warehouse clubs (1) "new or promoted product unless they carried the entire line," (2) "specials and exclusives" unless first shown to TRU "to see if TRU wanted the item," and (3) "[c]learance and closeout items" without giving TRU the right to buy first. *Id.* at 931-32. Each of the toy manufacturers predictably gave into TRU's pressure and agreed to only sell warehouse clubs "highly differentiated products" that were exclusive to the clubs. *Id.* Unsurprisingly, the FTC entered an order finding antitrust violations under both *per se* and rule of reason analyses. *See id.* at 932-33.

On appeal, TRU challenged that the FTC's finding of a horizontal conspiracy, arguing the record "show[ed] nothing more than a series of separate, similar vertical

14

McKool Smith Hennigan, P.C.
Los Angeles, CA

agreements between itself and various toy manufacturers." *Id.* at 935.  TRU further argued that its new policy "provided strong unilateral incentives for the manufacturer to reduce its sales to the clubs." *Id.*  The court summarized the sentiment of TRU's argument as follows: "[w]hy gain a few sales at the clubs . . . when [a manufacturer] would have much more to gain by maintaining a good relationship with the 100-pound gorilla of the industry, TRU, and make far more sales?" *Id.*  Unpersuaded by TRU's arguments, the *Toys "R" Us* court upheld the FTC's order, based, in part, on direct evidence that the toy manufacturers agreed to join the conspiracy only if their competitors did the same and were thus protected by TRU from "cheaters."  *See id.*

The parallels between the case at bar and *Toys "R" Us* are uncanny.  Not only does Fashion Nova make nearly identical arguments to TRU, but there is clear evidence here of Fashion Nova using its market power to enter agreements with vendors to boycott the competition.  *See Toys "R" Us*, 221 F.3d at 935-36; *see also United States v. Apple, Inc.*, 791 F.3d 290, 324 (2d Cir. 2015) ("A horizontal conspiracy can use vertical agreements to facilitate coordination without the other parties to those agreements knowing about, or agreeing to, the horizontal conspiracy's goals."); *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 222 (5th Cir. 2001) ("[W]e conclude that there can be sufficient evidence of a combination or conspiracy when one conspirator lacks a direct interest in precluding competition, but is enticed or coerced into knowingly curtailing competition by another conspirator who has an anticompetitive motive."); *William Holmes and Melissa Mangiaracina, Antitrust Law Handbook, Group Boycotts Generally* § 2:16 (2017) ("[E]ven purportedly involuntary participation in a conspiracy to boycott can still be viewed as an illegal boycott, since coerced but knowing acquiescence in an illegal scheme is still generally viewed as actionable participation.").

Remarkably, the *Toys "R" Us* court ***rejected the exact economic arguments advanced by Defendants' expert*** and endorsed the economic explanation of Honey Bum's expert.  Notwithstanding, "at the summary judgment stage[,] the judge's

15

McKool Smith Hennigan, P.C.
Los Angeles, CA

1    function is not himself to weigh the evidence and determine the truth of the matter but

2    to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby,*

3    *Inc.*, 477 U.S. 242, 249 (1986).   The divergent expert conclusions only serve to

4    underscore the inappropriateness of summary judgment here.   Accordingly, the

5    evidentiary record and applicable law dictate that the Motion be denied.

6         **4.**    ***Plaintiff need not show market power but can do so nonetheless.***

7         Defendants further assert that they are entitled to summary judgment because

8    Honey Bum has failed to demonstrate market power.   As discussed above in the

9    response to Defendants' arguments on antitrust injury, no consideration of market

10    evidence is necessary or required.   Rather, "*[p]er se* rules relieve plaintiffs of the

11    burden of proving anticompetitive effects, ***which are assumed***" in a *per se* case.

12    *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1443 (9th Cir. 1995) (emphasis

13    added).   All that is required is a showing that Honey Bum's injuries stemmed from

14    Defendants' illegal acts, which are clearly demonstrated here.   *See id.* at 1443-44.

15         Even if a showing of dominance was necessary (it is not), the evidence

16    indisputably demonstrates that the vendors possess near complete control of the L.A.

17    fast-fashion market.   For the purposes of Section 1, "market power" exists where an

18    entity possesses the "ability to alter the interaction of supply and demand in the

19    market." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468

20    U.S. 85, 109 (1984).   Defendants assert that the vendors lacked a "dominant position

21    in the relevant market" because "Honey Bum was able to obtain merchandise from

22    literally hundreds of other suppliers, both in Los Angeles and elsewhere." *See* Mot. at

23    p. 11.   Facts in dispute demonstrate that that those "hundreds of vendors," however,

24    are not comparable in any sense. *See e.g.* JDM Decl., Ex. 25 at 100:4-22.   In an effort

25    to artificially inflate the number of alternative vendors supposedly available to Honey

26    Bum, Defendants' expert uses a broad brush to paint the market as one of simply

27    ███████████ *See* Defendants' SOF ¶ 29.   In Defendants' expert's view, ██

28    ████████████████████████████████████████████████

McKool Smith Hennigan, P.C.
Los Angeles, CA

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1     █████████████████████████████████████ Not so.

2         As a practical matter, if these hundreds of other vendors were truly comparable,

3 Fashion Nova itself would be sourcing from them. The fact is that Fashion Nova has

4 no interest in engaging these other vendors because they either do not deal in the same

5 style of product, or are of lesser quality. Mr. Saghian was very clear on this point in

6 his deposition when he explained that ██████████████████████████████

7 ████████████████████████████ *See* JDM Decl., Ex. 17 at 37:1-

8 39:13. ████████████████████████████████████████████

9 ██████████████████████████████████████████ *See*

10 *id.* at 68:19-68:3. The pipeline of suppliers is critically important and is accomplished

11 *only* through relationship building. *See id.* at 41:8-68:3. In fact, Mr. Saghian

12 emphasized the importance of the L.A. vendor market in an interview in which he

13 stated: "Fashion Nova's production model has a competitive advantage because of

14 their partnership with Los Angeles based manufacturers. During the summer season,

15 *80 percent of the clothes are produced in Los Angeles*." *See* JDM Decl., Ex. 78

16 (emphasis added).

17         Even if Defendants put forth evidence disputing the vendors' dominance of the

18 L.A. fast-fashion market, summary judgment would be inappropriate because market

19 definition (and dominance therein) is a ***question of fact for the jury***. "[D]efining the

20 product market involves identification of the field of competition: the group or groups

21 of sellers or producers who have actual or potential ability to deprive each other of

22 significant levels of business." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875

23 F.2d 1369, 1374 (9th Cir. 1989) (citation omitted). "This definitional process is a

24 factual inquiry for the jury; the court may not weigh evidence or judge witness

25 credibility." *Id* (citation omitted); *see also Fineman v. Armstrong World Indus., Inc.*,

26 980 F.2d 171, 199 (3d Cir. 1992) (*citing Weiss v. York Hospital,* 745 F.2d 786, 825

27 (3d Cir. 1984)) ("[T]he determination of a relevant product market or submarket . . . is

28 a highly factual one best allocated to the trier of fact.").

McKool Smith Hennigan, P.C.
Los Angeles, CA

Notwithstanding the foregoing, the Supreme Court has recognized that "the absence of proof of market power does not justify a naked restriction on price or output." *NCAA*, 468 U.S. at 110. Instead, "when there is an agreement not to compete in terms of price or output, 'no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement.'" *Id.* (quoting *Nat'l Soc. of Pro. Engineers v. United States*, 435 U.S. 679, 692, 98 S. Ct. 1355, 1365, 55 L. Ed. 2d 637 (1978)). Thus, absent a "countervailing procompetitive justification, . . . a lengthy analysis of market power is not necessary." *NCAA*, 468 U.S. at 110.

Here, it is indisputable that the group boycott involves clear restrictions on price and output. The evidence unquestionably establishes that, in each instance, Honey Bum held preexisting relationships with the vendors. *See e.g.* JDM Decl., Ex. 9. Once Mr. Saghian learned that Honey Bum had formed new relationships with what he believed to be ***his*** suppliers, Defendants instituted a number of practices designed to preclude the vendors from selling to the open market—a pure restriction on output. *See* JDM Decl., Ex. 17 at 158:13-159. Because Defendants have not even attempted to offer a "countervailing procompetitive justification," they have failed to establish their entitlement to judgment as a matter of law.

**B.     Summary Judgment is Inappropriate as to the Tortious Interference Claims**

**1.     *Tortious interference with economic relations***

A tortious interference with economic relations claim requires a showing that (1) the plaintiff had an ongoing economic relationship with a third party, (2) that the defendant knew of, (3) when intentionally and actually disrupting the relationship, and (4) economic harm. *See Trans World Airlines, Inc.* v. *Am. Coupon Exch., Inc.,* 913 F.2d 676, 689 (9th Cir. 1990) (citation omitted). California courts impose an additional requirement that a defendant's actions be "wrongful by some measure beyond the fact of the interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376 (1995). An act is wrongful if "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Edwards v.*

MCKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

*Arthur Andersen LLP*, 44 Cal. 4th 937, 944 (2008).  Defendants limit their challenge to **only** the independent wrongfulness requirement.  In doing so, they adopt the position that Plaintiff's tortious interference with prospective business claims rises and falls with its Section 1 claim.  Defendants are mistaken.  In addition to violating Section 1, Defendants' conduct violated the *California Business and Professions Code*, which makes **unlawful** "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind."  Cal. Bus. & Prof. Code § 16600.  Because Defendants' illegal scheme resulted in the cancellation, prevention or otherwise restriction of a number of contracts plainly proscribed by statute, Defendants' lone argument fails and the Motion should be denied.

### 2.    *Tortious interference with contract.*

A claim for tortious interference with contracts requires a plaintiff to show:  (1) a valid contract with a third party, (2) that Defendants knew of, (3) Defendants' intentional and actual disruption of the contractual relationship, and (4) damages.  *See Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1124 (1990).

Here, Defendants lodge a variety of haphazard attacks against the tortious interference with contract claim, each of which contradict the facts and law and fail to satisfy Defendants' burden at summary judgment.  *First*, Defendants incorrectly aver that the purchase orders at issue represent "at-will" contracts.  An "at-will" contract is one that, **by its terms**, may be terminated for any reason at the prerogative of a single party.  *See Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1147 (2020).  Remarkably, Defendants do not point to the terms a single purchase order, but instead cite to self-serving deposition testimony that the purchase orders "are routinely canceled" by both parties.  This is not enough.  The terms of the agreements must expressly permit unilateral termination without legal repercussions.  *Id.*  Defendants have therefore failed to meet their summary judgment burden with respect to Honey Bum's tortious interference to contract claims.  *Second*, Defendants' assert that Honey Bum lacks evidence to support the claim is nonsensical.  However, the vendor

agreements were contracts.[6]   The undisputed evidence shows that Honey Bum submitted orders for delivery of clothes and the vendors subsequently confirmed such orders with terms relating to refunds and costs of cancellation.  *See* Cal. Com. Code § 2204 ("A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.").  Further, Defendants were clearly aware of the vendor agreements.  *See e.g.*, JDM Decl., Exs. 4, 62-77.   Nonetheless, representatives from both Bear Dance and DTE Trading testified that they canceled pending order from Honey Bum as a result of Defendants' tortious interference after valid contracts—containing all necessary terms such as style, price, quantity and delivery terms—had been formed and agreed upon.  *See* JDM Decl., Exs. 18, 19, 29, 30, 81.   Thus, the evidence unquestionably demonstrates that Defendants tortiously interfered with valid, enforceable contracts between Honey Bum and vendors.  *Lastly*, Defendants claim that Plaintiff must demonstrate an independently unlawful act in connection with this claim.  This is simply not a required element and should be entirely disregarded.

Accordingly, the Motion should be denied as to Plaintiff's tort claims.

## V.   **CONCLUSION**

For the foregoing reasons, plaintiff Honey Bum, LLC respectfully requests that the Motion be denied in its entirety.


DATED: November 30, 2021               **MCKOOL SMITH HENNIGAN, P.C.**

By: /s/ Jeffery D. McFarland
          Jeffery D. McFarland
          Grant J. Maxwell

          *Attorneys for Plaintiff Honey Bum, LLC*

MCKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

---

[6] *See* Cal. U. Com. Code § 2004 ("A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."). Here, Honey Bum submitted orders for delivery of clothes, the vendors confirmed such orders with terms relating to refunds and costs of cancellation, and confirmations of purchase were sent by the vendors. It is clear that the purchase orders constitute valid contracts.

4865-6351-7953

20